**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

YATSIRI MANRIQUEZ,

      Plaintiff,

v.                                                  Civ. No. 21-408 GBW/LF

ADRIENNE AMES, *et al.*,

      Defendants.

**<u>ORDER GRANTING PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S
FOURTH AMENDMENT CLAIMS FOR UNLAWFUL SEIZURE, AND
REQUESTING SUPPLEMENTAL BRIEFING ON PLAINTIFF'S FOURTH
AMENDMENT CLAIMS FOR UNLAWFUL SEARCH, PRETEXTUAL SEIZURE,
AND EXCESSIVE FORCE</u>**

THIS MATTER comes before the Court on Defendants Adrienne Ames and

Johnathen[1] War's Motion for Summary Judgment Based on Qualified Immunity (*doc.

31*). Having reviewed the Motion, its attendant briefing (*docs. 40, 42*), and being fully

advised in the premises, the Court GRANTS the Motion IN PART and DISMISSES

Plaintiff's Fourth Amendment claim for unjustified seizure WITH PREJUDICE. As the

same undisputed material facts underlie Plaintiff's Fourth Amendment claims for

---

[1] Plaintiff spells Defendant War's first name as "Jonathan" in the operative complaint. *See doc. 9* at 1. Defendant War's affidavit and briefing, as well as evidence provided by Plaintiff spell his first name as "Johnathen." *See doc. 31* at 1 n.1; *doc. 31-2* at ¶ 1; *doc. 40-3* at 5-6. Therefore, the Court adopts this spelling of his first name.

unlawful search, pretextual seizure, and excessive force, the Court also ORDERS

supplemental briefing on the propriety of summary judgment as to these claims.

## I.  BACKGROUND

This case arises from an investigatory vehicular stop conducted by Defendant

Ames, Defendant War, and other law enforcement officers on February 11, 2018, after a

man had shot and killed a gas station attendant during an armed robbery and fled the

scene in a pickup truck resembling the stopped vehicle.  *See* Undisputed Material Facts

("UMFs") 3, 8, 14, 23-24, *infra* at 7-14.  During this stop, Defendants pointed their guns

at Plaintiff—a passenger in the stopped vehicle—handcuffed her and detained her in

the backseat of Defendant War's vehicle until they ascertained that the driver of the

stopped vehicle was not the armed robber.  *See* UMFs 25-32, *infra* at 14-16.

Three years later, Plaintiff filed her Complaint for Violation of Constitutional

Rights in the 1st Judicial District Court, Santa Fe County, New Mexico.  *See Doc. 1-1* at 1.

She claimed the following: (i) her detention during the investigatory stop violated the

Fourth Amendment of the U.S. Constitution, *see id.* at ¶ 21; (ii) Defendants Ames, War,

and unknown New Mexico State Police Officers and Santa Fe Sheriff Deputies are liable

for this violation pursuant to 42 U.S.C. § 1983, *see id.*; and (iii) the New Mexico

Department of Public Safety ("NMDPS") and the County of Santa Fe Sheriff's

Department ("CSFSD") were liable for her detention under the theory of respondeat

superior, *see id.* at ¶ 22.

After CSFSD and Defendants Ames and War removed Plaintiff's Complaint to this Court, *see doc. 1*, Plaintiff amended her Complaint, *see doc.* 9. The Amended Complaint substituted Defendant Board of County Commissioners of Santa Fe County ("BCCSFC") for CSFSD, added unknown cross-deputized Pojoaque Police Officers as defendants, and changed Plaintiff's theory of liability for institutional Defendants from respondeat superior to that of *Monell v. Dep't of Social Services of the City of New York*, 436 U.S. 658 (1978).[2] *See id.* at ¶¶ 5, 14, 31. She also claims that Defendants Ames, War, and unknown Pojoaque Police Officers, New Mexico State Police Officers, and Santa Fe County Sheriff Deputies are liable under 42 U.S.C. § 1983 for four different Fourth Amendment violations: (i) seizing her without a warrant, probable cause, reasonable suspicion, or any other justification; (ii) using excessive force against her during that seizure; (iii) gathering personal information from her during and after that seizure; and (iv) seizing her as pretext for a discriminatory, or other unspecified, purpose. *Id.* at ¶¶ 28-30. Finally, she alleges that her seizure and treatment violate the equal protection and due process clauses of the Fourteenth Amendment of the U.S. Constitution but only asserts a claim of liability for these violations against Defendant BCCSFC. *See id.* at ¶ 31; *cf. id.* at 29-30 (asserting only Fourth Amendment claims against other Defendants).

---

[2] In her Amended Complaint, Plaintiff also added as parties the individual members of Defendant BCCSFC in their official capacities and maintained her claims against Defendant NMDPS. *See doc. 9* at ¶¶ 5-6. Plaintiff has since voluntarily dismissed her claims against the individual board members and Defendant NMDPS. *See docs. 20, 26, 27.*

On June 21, 2021, Defendants Ames and War filed the instant Motion for

Summary Judgment Based on Qualified Immunity, which construes the Amended

Complaint to raise a single Fourth Amendment claim of unlawful seizure against them

and asks the Court to dismiss with prejudice the Amended Complaint as to them.  *See*

*doc. 31* at 20.  Plaintiff filed her response on September 13, 2021, *see doc. 40*, after the

parties stipulated to two extensions of her briefing deadline, *see docs. 36, 39*.  Briefing

was complete on this Motion on October 21, 2021, *see doc. 44*, when Defendants filed

their reply, *see doc. 42*, pursuant to the parties' stipulated deadline, *see doc. 41*.

## II.  LEGAL STANDARDS

### A.  SUMMARY JUDGMENT UPON MOTION BY A PARTY

Under Federal Rule of Civil Procedure 56(a), this Court must "grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The

movant bears the initial burden of showing "that there is an absence of evidence to

support the nonmoving party's case."  *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d

887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once

the movant meets this burden, the non-moving party is required to designate specific

facts showing that "there are . . . genuine factual issues that properly can be resolved

only by a finder of fact because they may reasonably be resolved in favor of either

party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

4

Notably, however, summary judgment motions based upon the defense of qualified immunity are reviewed differently from other summary judgment motions. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Id*. (citing *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009)). This "strict two-part test" must be met before the defendant asserting qualified immunity "bear[s] the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008) (quoting *Nelson v. McMullen*, 207 F.3d 1202, 1205 (10th Cir. 2000)). The Court may address the two prongs of the test in any order. *Pearson*, 555 U.S. at 236.

In determining whether Plaintiff has met her burden to overcome a qualified immunity defense, the Court construes the facts in the light most favorable to her as the non-movant. *See Scott v. Harris*, 550 U.S. 372, 377 (2007). In so doing, the Court keeps three principles in mind. First, the Court's role is not to weigh the evidence, but to assess the threshold issue of whether a genuine issue exists as to material facts requiring a trial. *See Liberty Lobby*, 477 U.S. at 249. "An issue is 'genuine' if there is sufficient evidence on each side such that a rational trier of fact could resolve the issue either way. An issue of fact is 'material' if under the substantive law it is essential to the proper

disposition of the claim." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (internal citation omitted). Second, the court cannot decide any issues of credibility. *See Liberty Lobby*, 477 U.S. at 255. Third, "to survive the . . . motion, [the nonmovant] need only present evidence from which a jury might return a verdict in his favor." *Id*. at 257. Nonetheless, at the summary judgment stage, "a plaintiff's version of the facts must find support in the record." *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009).

### B. SUMMARY JUDGMENT INDEPENDENT OF A MOTION

In addition to a granting a movant summary judgment upon proper motion, the Court may enter a summary judgment on a party's claim or defense *sua sponte* "[a]fter giving [the parties] notice and a reasonable time to respond [and] identifying for the parties material facts that may not be genuinely in dispute." Fed. R. Civ. P. 56(f). This practice is appropriate "so long as the losing party was on notice that it had to come forward with all of its evidence." *A.M. v. Holmes*, 830 F.3d 1123, 1136 (10th Cir. 2016) (cleaned up) (quoting *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 892 (10th Cir. 1997)).

### III. UNDISPUTED MATERIAL FACTS ("UMFs")

Based on the parties' briefing and the record as a whole, the Court (i) finds the following facts material and undisputed[3] for purposes of Defendants Ames and War's Motion for Summary Judgment and (ii) identifies the following facts to the parties as undisputed material facts sufficient for it to enter a summary judgment on Plaintiff's claims of unreasonable search, pretextual seizure, and excessive force in favor of these Defendants:

A. ARMED ROBBERY OF EDGEWOOD GAS STATION

1. On February 11, 2018, Defendants Ames and War were sworn, duly commissioned New Mexico law enforcement officers employed by the Santa Fe County Sheriff's Department. Defendants' Statement of Undisputed Material Facts ("DSUMF") 1.

2. That afternoon, Defendants Ames and War were on duty, patrolling in northern Santa Fe County, New Mexico, and monitoring radio communications to and from the Santa Fe Regional Emergency Communications Center ("dispatch"). DSUMF 2-3.

---

[3] Where the Court cites to a party's statement of fact, it does so pursuant to Federal Rule of Civil Procedure 56(c)(1) because the evidence cited by the party for that fact supports the Court's finding and, if the other party has disputed this fact, the evidence cited by that party does not genuinely dispute that finding. Where the Court cites to evidence in the record, it does so pursuant to Federal Rule of Civil Procedure 56(c)(3), which permits consideration of "other materials in the record." *See* Fed. R. Civ. P. 56(c)(3).

3. Starting at approximately 3:53 p.m., Defendants Ames and War heard a series of radio communications reporting an armed robbery at a gas station in Edgewood, New Mexico (a town in the southern part of Santa Fe County). The communications reported that a man had shot someone twice in the chest and stomach and fled the scene in a vehicle with tinted windows, heading eastbound on Interstate 40.   DSUMF 4-5; *see also* Exhibit D to Motion for Summary Judgment Based on Qualified Immunity ("Exhibit D") 2018-02-11_15.55.25_Ch64 at 0:00-0:06; Exhibit D 2018-02-11_15.55.42_Ch64 at 0:00-0:06; Exhibit D 2018-02-11_15.56.21_Ch 64 at 0:00-0:08.[4]

---

[4] Plaintiff disputes DSUMF 5 to the extent that Defendant Ames and War assert that an unknown number of occupants were in the suspect's getaway vehicle.  *See* Plaintiff's Response to Defendant's Undisputed Material Facts ("PRDUMF") 5 (citing *doc. 40-1*).  The number of occupants *actually* in the suspect's vehicle and the number of occupants *reported* to be in the suspect's vehicle are two separate issues.  Based on Defendant Ames' affidavit, Defendants Ames and War assert that dispatch radio transmissions reported "that an unknown number of occupants were in the suspect vehicle."  DSUMF 5 (citing *doc. 31-1* at ¶ 8). The police reports and witness statements Plaintiff cites to rebut this assertion contain information about the number of persons *in* the getaway vehicle, not the number of persons *reported to be in* that vehicle.  *See generally doc. 40-1.*  Therefore, Plaintiff's evidence does not rebut Defendants Ames and War's assertion. However, the "contemporaneous radio communications … to and by dispatch," *doc. 42* at 2, that Defendants Ames and War provide in Exhibit D dispute Defendant Ames' affidavit.  There are no reports on channels 64 and 65—the channels used by law enforcement officials to communicate with each other on February 11, 2018—about an unknown number of occupants in the suspect's getaway vehicle before Defendant Ames seized Plaintiff.  The audio provided in Exhibit D does contain recordings of 911 calls and calls to other regional dispatch centers on other channels where the participants reported that the number of occupants in the vehicle was unknown.  *See, e.g.*, Exhibit D 2018-02-11_15.58.31_Ch5 at 1:10-1:12; Exhibit D 2018-02-11_16.01.47_Ch5 at 0:29-0:45.  The Court has no evidence that Defendants Ames and War could and were monitoring these other channels.  Therefore, it makes no finding about whether dispatch had reported that the number of occupants in the getaway vehicle was unknown before Defendant Ames stopped the vehicle containing Plaintiff and assumes for the purposes of its analysis that dispatch made no such report.

4. At approximately 3:57 p.m., dispatch advised that the getaway vehicle was a two-door pickup truck with an extended cab.  Exhibit D 2018-02-11_15.57.25_Ch 64 at 0:06-0:08.

5. At approximately 4:02 p.m., dispatch updated its description of the getaway vehicle to a white Chevy two-door pickup truck with an extended cab that possibly had stickers on the back.  Exhibit D 2018-02-11_16.02.50_Ch 64 at 0:00-0:09.

6. From approximately 4:19 p.m. to 4:20 p.m., radio communications to dispatch advised that the getaway vehicle had four doors, possibly had seventeen-inch rims, and contained two male occupants—one of whom was older, tan-skinned, and wearing a cowboy hat and jeans.  Exhibit D 2018-02-11_16.19.13_Ch 64 at 0:00-0:11; Exhibit D 2018-02-11_16.19.39_Ch 64 at 0:02-0:09; Exhibit D 2018-02-11_16.20.02_Ch 64 at 0:00-0:03.

7. At approximately 4:27 p.m., radio communications to dispatch advised that, based on video from the scene, the suspect was a man wearing a white, hooded Under Armour sweatshirt with the hood up.  Exhibit D 2018-02-11_16.27.21_Ch 64 at 0:00-0:08.[5]

---

[5] Based on Defendant Ames' affidavit, DSUMF 5 states that dispatches also described the suspect as wearing "dark athletic shoes with white soles."  DSUMF 5 (citing *doc. 31-1* at ¶ 8).  Exhibit D's dispatch recordings contain no such dispatches until Defendant Ames asked Sheriff's Deputy Cassandra Reed about the suspect's shoes at approximately 5:42 p.m.  *See* Exhibit D 2018-02-11_17.42.35_Ch65 at 0:00-0:03; Exhibit D 2018-02-11_17.42.40_Ch65 at 0:00-0:08.  The inconsistency between Defendant Ames' affidavit and the dispatch recordings before 5:42 p.m. creates an issue of fact about whether dispatch described the

8. At approximately 5:06 p.m., dispatch reported that the shooting victim had died from his wounds.  Exhibit D 2018-02-11_17.06.08_Ch 64 at 0:01-0:03.[6]

B. DEFENDANT AMES SEES AND FOLLOWS A VEHICLE THAT CONTAINED PLAINTIFF AND RESEMBLED THE SUSPECT'S GETAWAY VECHILE

9. While patrolling in in Pojoaque, Santa Fe County, New Mexico, Defendant Ames was aware that the suspect's last reported flight route could take him northbound on U.S. Highway 84/285.  DSUMF 6.

10. At approximately 5:23 p.m., Defendant Ames observed a white, 4-door extended cab Chevy pickup truck with tinted windows and seventeen-inch, chrome rims turn east from northbound U.S. Highway 84/285 onto Viarrial Street in Pojoaque.  DSUMF 7.

---

suspect as wearing dark athletic shoes with white soles before Defendant Ames conferred with Deputy Reed.  Accordingly, the Court makes no finding on this issue and assumes for the purposes of its analysis that dispatch did not describe the suspect's shoes before Defendant Ames spoke with Deputy Reed.
[6] Based on Defendant Ames' affidavit, DSUMF 4 asserts that "[a]t approximately 4:04 p.m., dispatch reported that the victim had died as a result of his gunshot wounds while he was being airlifted to the hospital."  DSUMF 4 (citing *doc. 31-1* at ¶ 7).  No such assertion is contained in Exhibit D's dispatch recordings.  According to these communications, dispatch first advised at approximately 4:11 p.m. and 4:13 p.m. that the victim had lost his pulse, *see* Exhibit D 2018-02-11_16.11.10_Ch 64 at 0:06-0:08; Exhibit D 2018-02-11_16.13.07_Ch 65 at 0:01-0:03; Exhibit D 2018-02-11_16.13.16_Ch 65 at 0:00-0:03, and then advised at 5:06 p.m. that the victim had died in transit to the hospital, *see* Exhibit D 2018-02-11_17.06.08_Ch 64 0:01-0:03.  The inconsistency between Defendant Ames' affidavit and the audiotape creates an issue of fact about whether dispatch reported that the victim was deceased at approximately 4:04 p.m., in addition to reporting him deceased at 5:06 p.m. Accordingly, the Court makes no finding on this issue and assumes, for the purposes of its analysis, that dispatch did not report that the gunshot victim was deceased at approximately 4:04 p.m.

11.  As this truck approached her, Defendant Ames observed that its driver,

Manuel Grado, was a male wearing a white hooded sweatshirt with the hood

up.  DSUMF 7, 8 n.2.

12.  Defendant Ames followed this truck to the driveway of a mobile home in

Butterfly Springs Mobile Home Park.  DSUMF 8-9.

13.  While the truck was parked in the driveway, Defendant Ames observed the

following: (i) Plaintiff sitting in the right front passenger seat; (ii) Juan

Rodriguez exit the mobile home and enter the truck through the right rear

passenger door; (iii) Mr. Grado exit the truck, open the left rear passenger

door, reach into the back seat, close the door, and get back into the driver's

seat; and (iv) Mr. Grado wearing dark athletic shoes with white soles.

DSUMF 9; *see also doc. 40-2* at ¶ 4.

14.  Based on the truck's resemblance to the description of the suspect's getaway

vehicle and Mr. Grado's resemblance to the suspect, Defendant Ames

decided to stop the truck to investigate Mr. Grado and requested that

dispatch send back up.  DSUMF 10; *see also* Exhibit D 2018-02-11_17.31.52_Ch

64 at 0:00-0:02; Exhibit D 2018-02-11_17.32.12_Ch 64 at 0:01-0:13.

15.  Dispatch sent Defendants War and two unknown Pojoaque Police Officers to

Defendant Ames' location.  DSUMF 10; *see also* Exhibit D 2018-02-

11_17.32.01_Ch 64 at 0:00-0:02; Exhibit D 2018-02-11_17:34:44_Ch64 at 0:00-0:03.

16. While Defendant Ames waited for backup, *see* Exhibit D 2018-02-11_17.32.35_Ch 64 at 0:01-0:04, the truck left the mobile home and proceeded northbound on U.S. Highway 84/285 with Plaintiff, Mr. Grado, and Mr. Rodriguez inside, DSUMF 10.

17. Defendant Ames followed the truck. *Id.*

18. While following the truck, Defendant Ames contacted Sheriff's Deputy Cassandra Reed—who had reviewed surveillance video from the shooting at the Edgewood gas station—described Mr. Grado as a slender man with facial hair wearing a white hooded sweatshirt with a large black stripe down the center of it, asked whether Mr. Grado resembled the suspect, and requested that Deputy Reed describe the suspect's shoes. *See id.*; Exhibit D 2018-02-11_17.35.55_Ch64 at 0:02-0:12; Exhibit D 2018-02-11_17.36.21_Ch64 at 0:02-0:05; Exhibit D 2018-02-11_17.42.35_Ch65 at 0:00-0:03.

19. Deputy Reed advised Defendant Ames that surveillance video showed the suspect wearing a white hooded sweatshirt with a dark Under Armour logo on the hood and dark colored athletic shoes with white soles. DSUMF 10; *see also* Exhibit D 2018-02-11_17.36.29_Ch64 at 0:00-0:03; Exhibit D 2018-02-11_17.42.40_Ch65 at 0:00-0:06.

20. Based on her observation of Mr. Grado, Defendant Ames could not tell

    whether his hooded sweatshirt had an Under Armour logo on it.  DSUMF 10;

    *see also* Exhibit D 2018-02-11_17.40.37_Ch65 at 0:05-012

## C. DEFENDANTS AMES, WAR, AND TWO UNKNOWN POJOAQUE POLICE OFFICERS SEIZE PLAINTIFF

21. Defendant War and then the two unknown Pojoaque Police Officer

    Defendants caught up to Defendant Ames after she had followed the truck

    onto New Mexico State Road 503.  DSUMF 11-12; *see also* Exhibit D 2018-02-

    11_17.40.05_Ch64 at 0:00-0:06.

22. As backup arrived, Defendant Ames decided to not stop the truck until the

    Pojoaque Police Officers had caught up and the truck had reached a section of

    road with fewer roadside residences and a wider right shoulder due to her

    concern that the truck's occupants may open fire or attempt to flee during the

    stop.  DSUMF 12; *see also* Exhibit D 2018-02-11_17.40.37_Ch65 at 0:01-05;

    Exhibit D 2018-02-11_17.41.18_Ch65; Exhibit D 2018-02-11_17.44.37 at 0:01-

    0:04.[7]

---

[7] Plaintiff disputes DSUMF 12 as to Defendant Ames' concern for officer and public safety.  *See* PRDUMF 12 (citing *doc.* 40-2 at ¶¶ 4-7).  She contends that Defendant Ames' decisions to allow another passenger to join the two already in the truck and follow the truck for almost thirty minutes while waiting for backup are inconsistent with her expressed concern for officer and public safety.  *See id.*  Such conjecture is not evidence that Defendant Ames did not have this concern and so does not discharge Plaintiff's burden providing evidence to dispute DSUMF 12.

23. At approximately 5:45 p.m., a few minutes after the two unknown Pojoaque
    Officer Defendants caught up to Defendants Ames and War, *see* Exhibit D
    2018-2-11_17.44.24_Ch 64 at 0:00-0:03; Exhibit D 2018-2-11_17.45.23_Ch 64 at
    0:00-0:03, Defendant Ames concluded that they had reached a suitable stretch
    of New Mexico Road 503 to stop the truck and she and Defendants War and
    the two unknown Pojoaque Police Officers (collectively, "Officer
    Defendants") engaged their emergency equipment, DSUMF 13; *see also*
    Exhibit D 2018-2-11_17.45.27_Ch 64 at 0:01-10.

24. After the truck stopped, Officer Defendants exited their vehicles, drew their
    handguns, and pointed them at the truck.  DSUMF 14.

25. Defendants Ames and War instructed Mr. Grado to do the following: (i)
    alight from the truck with his hands raised; (ii) remove his sweatshirt and
    throw it in the truck; (iii) walk slowly backwards towards the officers with his
    hands raised; and (iv) drop to his knees with his hands up and fingers laced
    over his head.  *Id*.; *see also* Exhibit C Axon Body 2 Video X81030269 2018-02-11
    174600 at 0:59-2:24.

26. After Mr. Grado dropped to his knees, Defendant Ames handcuffed him,
    placed him in the back seat of her vehicle, obtained his name, address, date of
    birth and other identifying information from him, and informed him that the
    officers would explain what was happening shortly.  DSUMF 14; *see also*

Exhibit C Axon Body 2 Video X81030269 2018-02-11 174600 at 2:18-2:59;

Exhibit C Axon Body 2 Video X81099996 2018-02-11 174838 at 0:12-2:10, 2:53-3:00.

27. The Officer Defendants handcuffed, detained, and obtained identifying information from Plaintiff and Mr. Rodriguez in the same manner, one after the other, with Defendant War placing Plaintiff in the back seat of his vehicle and Mr. Rodriguez in the back seat of the vehicle of one of the Pojoaque Police Officers.  DSUMF 14; *see also* Exhibit C Axon Body 2 Video X81030269 2018-02-11 174600 at 3:05-4:42, 8:27-9:11 (Plaintiff); Exhibit C Axon Body 2 Video X81030269 2018-02-11 174600 at 4:13-6:24, 7:11-8:03 (Mr. Rodriguez).

28. While Plaintiff, Mr. Grado, and Mr. Rodriguez alighted from the truck and walked backwards towards the Officer Defendants, the Officer Defendants pointed their guns at them.  Plaintiff's Statement of Undisputed Material Facts ("PSUMF") 3.

29. After Plaintiff was handcuffed and placed in the back of Defendant War's vehicle, and as Mr. Rodriguez was being handcuffed and placed in the back of another vehicle, Defendant Ames photographed Mr. Grado's face and white hooded sweatshirt and sent the photos to Deputy Reed.  DSUMF 16; *see also* Exhibit C Axon Body 2 Video X81099996 2018-02-11 174838 at 2:19-2:32.

30. Deputy Reed reviewed the photos and informed Defendant Ames that Mr. Grado was not the man who had shot the gas station attendant in Edgewood. DSUMF 16.

31. Upon receiving this information, Defendant Ames and the other Officer Defendants released Plaintiff, Mr. Grado, and Mr. Rodriguez from handcuffs, informed them that they had been detained because Mr. Grado's clothing and vehicle resembled those of the suspect, and allowed Plaintiff, Mr. Grado, and Mr. Rodriguez to return to the truck and depart.  DSUMF 16.

32. The stop lasted approximately 12-13 minutes.  DSUMF 17.

### D. DEFENDANTS AMES, WAR, AND TWO UNKNOWN POJOAQUE POLICE OFFICERS SEIZE PLAINTIFF

33. Later that evening, one of the Officer Defendants called Mr. Rodriguez and asked to speak to Plaintiff.  PSUMF 11.

34. After Mr. Rodriguez passed Plaintiff the phone, the officer asked Plaintiff for her name, address, and phone number, which she provided to him.  *Id.; see also doc. 40-2* at ¶ 12.

## IV. ANALYSIS

The Fourth Amendment of the United States Constitution protects Plaintiff from "unreasonable searches and seizures," *see* U.S. Const. amend. IV, but the doctrine of qualified immunity prevents her from obtaining recompense for an unreasonable search

or seizure under 42 U.S.C. § 1983 unless the unreasonableness of that search or seizure was clearly established, *see District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018).  As previously noted, Plaintiff claims that Defendants Ames and War violated her Fourth Amendment rights in four ways: (i) seizing her without probable cause, reasonable suspicion, or any other justification; (ii) seizing her with excessive force by pointing firearms at her and handcuffing her; (iii) seizing her as a pretext for a discriminatory, or other unspecified, purpose; and (iv) asking her for personal information during and after her detention.  *See doc. 9* at ¶¶ 28-30.  Defendants Ames and War plead the qualified immunity defense on all claims, *see doc 19* at 4, but their Motion only requests summary judgment on Plaintiff's claim for unlawful seizure, *see generally doc. 31*. Therefore, while the same undisputed material facts underlie Plaintiff's claims for excessive force, pretextual seizure, and unlawful search, the Court does not rule on whether Defendants Ames and War are entitled to summary judgment on these claims at this time.  *See* Fed. R. Civ. P. 56(f)(3).

A.  DEFENDANTS AMES AND WAR'S SEIZURE OF PLAINTIFF WAS LAWFUL

Turning to the claim that the Court may consider, the Court finds that Defendants Ames and War are entitled to summary judgment on Plaintiff's claim for unlawful seizure because their seizure of Plaintiff did not violate her Fourth Amendment rights.  Under the circumstances, handcuffing Plaintiff at gunpoint and detaining her in the back of Defendant War's vehicle for twelve or thirteen minutes

were reasonable measures to ensure officer safety for the pendency of Defendant Ames'

investigation of whether the driver of the vehicle in which Plaintiff was a passenger had

recently committed an armed robbery.

Broadly speaking, "[t]o determine whether a seizure is unconstitutional, '[the

Court] balance[s] the nature and quality of the intrusion on the individual's Fourth

Amendment interests against the importance of the governmental interests alleged to

justify the intrusion." *United States v. Salas-Garcia*, 698 F.3d 1242, 1248 (10th Cir. 2012)

(quoting *Weigel v. Broad*, 544 F.3d 1143, 1162 (10th Cir. 2008)).  Using this balancing test,

"[t]he Supreme Court has identified three types of police/citizen encounters: consensual

encounters, investigative stops, and arrests." *Cortez v. McCauley*, 478 F.3d 1108, 1115

(10th Cir. 2007) (quoting *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000)).

"Consensual encounters are not seizures within the meaning of the Fourth

Amendment," and so fall outside its protections. *Id.*  Investigative stops are "seizures of

limited scope and duration," which must be "justified at … inception" and have scopes

that are "reasonably related" to their justifications. *Salas-Garcia*, 698 F.3d at 1248.

Finally, arrests are "characterized by the intrusive or lengthy nature of the detention,"

and must be supported by probable cause of criminal activity. *Morris v. Noe*, 672 F.3d

1185, 1192 (10th Cir. 2012).  A seizure that starts as an investigative detention becomes

an unlawful arrest if the extent of its intrusion on the detainee's Fourth Amendment

interests exceeds that allowed by its justification.  *Lundstrom v. Romero*, 616 F.3d 1108, 1120 (10th Cir. 2010).

Here, the lawfulness of Plaintiff's seizure depends on whether it was an investigative (or protective[8]) stop or an arrest, as Defendants Ames and War did not have probable cause to believe that she had committed any crime.  Given the circumstances, the Court concludes that Plaintiff's seizure was a lawful protective detention, justified at its inception by a reasonable suspicion that the driver of the vehicle containing Plaintiff had recently committed an armed robbery and justified in its scope by a reasonable belief that Plaintiff posed a danger to officer safety during the investigation of this driver.

### 1. *Plaintiff's Initial Seizure*

Plaintiff's protective detention was justified at its inception.  Defendants Ames and War first seized Plaintiff when they stopped the truck containing her, *see Brendlin v.*

---

[8] A seizure does not have to be "investigatory" in nature to fall within the ambit of the investigatory stop doctrine.  *Terry v. Ohio*, 392 U.S. 1 (1968)—the seminal case recognizing the doctrine of investigatory detentions—reasons that "in justifying the particular intrusion [into an individual's Fourth Amendment liberties,] the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21.  The facts in *Terry* supported a reasonable suspicion of an individual's involvement in criminal activity, which the Supreme Court found justified detaining that individual "for purposes of investigating possibly criminal behavior," *see id.* at 22-23, (thereby giving rise to the term "investigatory stop").  *Terry's* broader reasoning, though, extends to other factual contexts.  For instance, where specific, articulable facts give rise to a reasonable belief that an individual poses a threat to the safety of officers engaged in specific investigative or community caretaking activities, that belief may justify detaining that individual.  *See, e.g., Lundstrom*, 616 F.3d at 1124; *United States v. Maddox*, 388 F.3d 1356, 1362, 1365 (10th Cir. 2004) (calling such a detention a protective detention); *United States v. King*, 990 F.2d. 1552, 1561 (10th Cir. 1993).

*California*, 551 U.S. 249, 257 (2007), to investigate whether its driver had recently

committed an armed robbery and fled the scene in that truck, *see* UMF 14.  This seizure

was justified at inception if Defendant Ames and War's suspicion of the driver's

involvement in criminal activity was reasonable.  *See United States v. Mosely*, 743 F.3d

1317, 1328 (10th Cir. 2014).  An individual is reasonably suspected of involvement in

criminal activity if he matches the description of the suspect of a crime or is driving a

vehicle that resembles one recently involved in a nearby crime.  *See Ellsworth v. City of

Broken Arrow*, 850 F. App'x 619, 622-23 (10th Cir. 2021) (matching vehicle); *United States

v. Shareef*, 100 F.3d 1491, 1505 (10th Cir. 1996) (matching description of suspect).

Here, the driver of the truck containing Plaintiff matched the description of a

suspect that Defendant Ames had heard over dispatch and confirmed with Deputy

Reed: a male wearing a white hooded sweatshirt and dark athletic shoes with white

soles.  *See* UMFs 7, 11, 13, 18-20.  Similarly, the truck itself matched the description and

possible direction of travel of the suspect's getaway vehicle: a white four-door Chevy

pickup truck with tinted windows and seventeen-inch rims, which may be headed

northbound on U.S. Highway 84/285.  *See* UMFs 3, 5-6, 9-10.  These matching

descriptions made Defendants Ames and War's suspicion of the driver's involvement in

the armed robbery reasonable, justifying their seizure of Plaintiff at its inception.

Plaintiff emphasizes that Defendants Ames and War did not reasonably suspect

her of any criminal activity, *see doc. 40* at 11, which may be construed as an argument

that her seizure was not justified at inception.  Officers, though, do not need an

individualized suspicion of criminal activity for each occupant of a vehicle to stop that

vehicle to investigate one of its occupants (thereby seizing all occupants).  *See, e.g.,*

*United States v. Rice*, 483 F.3d 1079, 1083 (10th Cir. 2007) (noting that the seizure of a

passenger in a vehicle was justified at inception since the vehicle did not have a tag

light illuminating its rear license plate in violation of state traffic laws).

2. *Handcuffing Plaintiff at Gunpoint and Detaining Her in the Back of a Law Enforcement Vehicle*

Ordering Plaintiff out of the vehicle at gunpoint, handcuffing her, and placing

her in the back of Defendant War's vehicle for twelve to thirteen minutes were

protective measures that Defendants Ames and War reasonably believed were

necessary to mitigate the threat that they reasonably perceived Plaintiff to pose to

officer safety.  Therefore, while seizing Plaintiff in this manner was intrusive, it did not

make her seizure an arrest requiring probable cause.

Officers may take precautionary measures "as are reasonably necessary to

protect their personal safety … during the course of a *Terry* stop."  *United States v.*

*Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993) (cleaned up) (quoting *United States v. Hensley*,

469 U.S. 221, 235 (1985), and citing *Terry v. Ohio*, 392 U.S. 1, 23-24 (1968)).  "'The use of

firearms, handcuffs, and other forceful techniques generally exceed the scope of an

investigative detention and enter the realm of an arrest."  *Cortez*, 478 F.3d at 1115-1116

21

Case 1:21-cv-00408-GBW-LF   Document 52   Filed 03/11/22   Page 22 of 33


(cleaned up) (quoting *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir.

1994)).  But this generality is not a bright-line rule.  *United States v. Windom*, 863 F.3d

1322, 1330 (10th Cir. 2017).  Officers may handcuff an individual at gunpoint during an

investigative stop without transforming it into an arrest if they reasonably believe that

an individual poses a threat to officer safety and that firearms and handcuffs are

necessary to mitigate that threat.  *See, e.g., id.* (gathering cases); *Lundstrom*, 616 F.3d at

1121 ("The use of guns in connection with a stop is permissible where the police

reasonably believe the weapons are necessary for their protection." (cleaned up)

(quoting *United States v. Neff*, 300 F.3d 1217, 1220 (10th Cir. 2002))); *Lundstrom*, 616 F.3d

at 1122 ("Officers are authorized to handcuff individuals during the course of

investigative detentions if doing so is reasonably necessary to protect their personal

safety ….").

  Whether an officer reasonably believes that an individual poses such a threat to

officer safety that firearms and handcuffs are necessary to detain her "is a fact-sensitive

inquiry and depends on 'the totality of circumstances in a given case.'"  *Salas-Garcia*, 698

F.3d at 1249 (quoting *United States v. Banks*, 540 U.S. 31, 36 (2003)).  It "is evaluated from

the perspective of a reasonable officer on the scene, recognizing the police officer may

have been forced to make split-second decisions in a stressful, dynamic, and dangerous

environment."  *Lundstrom*, 616 F.3d at 1120.

Tenth Circuit precedent reveals several principles relevant to the reasonableness of a concern for officer safety. First, the occupant of a vehicle may reasonably be perceived to pose a threat to officer safety that necessitates handcuffing her at gunpoint if another occupant of the vehicle is reasonably believed to be armed and dangerous. *See Shareef*, 100 F.3d at 1506 (holding that police officers reasonably handcuffed five occupants of three vehicles at gunpoint due to concerns of officer safety since, *inter alia*, the vehicles had been traveling at night in a convoy and a sixth occupant matched the description of a man wanted on an out-of-state gun charge).

Second, the occupant of a vehicle may reasonably be believed to threaten officer safety if she is reasonably perceived to have access to a firearm, and there is no indication that she is not dangerous. *See Salas-Garcia*, 698 F.3d at 1250-51 (holding that officers reasonably believed that the occupant of a vehicle was armed and posed a danger to them where the only information they had about him was that he was involved in drug transaction for one kilogram of cocaine as drug dealing is associated with guns); *Mosley*, 743 F.3d at 1330 (holding that officers reasonably perceived that the occupant of a vehicle was a danger to them where the only information they had about this occupant was that he and other man were sitting in the vehicle at three in the morning in a high crime area where previous shootings had occurred and one of them reportedly had a gun); *Perdue*, 8 F.3d at 1463 (holding that officers reasonably considered the occupant of a vehicle a danger to them based on a reasonable belief that

he had a gun in the vehicle or on his person as the only information that the officers had about the occupant was that he was in a vehicle approaching the rural property on which the officers had found marijuana and guns); *cf. United States v. King*, 990 F.2d 1552, 1563 (10th Cir. 1993) (holding that the presence of an apparently loaded pistol in easy reach of a vehicle's driver did not justify an officer ordering the driver out of the vehicle at gunpoint and handcuffing him to separate him from the gun, since the driver was not believed to be dangerous, the officer had initiated the seizure to get the driver to stop honking his horn at the scene of an accident, and the driver had stopped honking his horn and apologized for the commotion as the officer approached the vehicle).

Third, the occupant of a vehicle may not reasonably be thought to pose a threat to officer safety that necessitates handcuffing her at gunpoint if the occupant has complied with officer instructions and there is no indication that the occupant is dangerous. *See, e.g.*, *Maresca v. Bernalillo Cnty.*, 804 F.3d 1301, 1309-10 (10th Cir. 2015) (holding that officers had no reasonable basis to handcuff the occupants of a vehicle at gunpoint as there was no indication that the occupants were "armed and dangerous" and the occupants had "fully cooperated by pulling over and complying with every directive the officers gave"); *Melendez-Garcia*, 28 F.3d at 1053 (holding that officers did not reasonably believe that a vehicle's driver, who was reasonably suspected of drug trafficking, posed a danger to them as there was no tip or observation that the driver

was armed or violent and the driver complied with orders to stop off the road and step out of his car); *cf. Shareef*, 100 F.3d at 1506 (holding that the officers reasonably believed that the passengers in a convoy of three vehicles posed a threat to their safety since, *inter alia*, the vehicles did not stop immediately when signaled, and the vehicles' drivers did not produce drivers' licenses when asked for them).

Applying these principles to the situation at bar, the Court concludes that Defendants Ames and War reasonably perceived that Plaintiff posed such a threat to officer safety that it was necessary to handcuff her at gunpoint and detain her in the back of Defendant War's vehicle for twelve to thirteen minutes. Like the occupants of the vehicles in *Shareef* whom officers lawfully handcuffed at gunpoint for posing a threat to officer safety due to their association with another occupant who was reasonably believed to be wanted for a crime involving a firearm, *see* 100 F.3d at 1506, Plaintiff was traveling in a vehicle with an individual reasonably suspected to have shot and killed someone in the course of a burglary, *see* UMFs 3, 5-8, 10-11, 13-14, 18-19. Defendants Ames and War also reasonably believed that Plaintiff had access to a firearm by virtue of traveling in a vehicle reasonably believed to contain one, *see* UMF 22, like the driver of the vehicle in *Perdue* whom officers lawfully ordered out of his vehicle and onto the ground at gunpoint based on an analogous belief, *see* 8 F.3d at 1463.

Unlike the officers in *King*, Defendants Ames and War had no information about Plaintiff or interactions with her that would have led a reasonable officer to believe that she was not dangerous.  Plaintiff and the other occupants of the vehicle did cooperate with Defendants Ames and War's instructions to stop the vehicle, alight from the vehicle, and walk backwards towards them with their hands in the air.  *See* UMFs 26-27. But this cooperation did not dissipate the reasonable apprehension that Plaintiff was dangerous given the reasonable beliefs about her access to a firearm and her association with an individual suspected to have recently committed a violent crime with a firearm. *See Ellsworth*, 850 F. App'x at 624-26 (holding that officers reasonably handcuffed two of the five occupants of a vehicle at gunpoint despite these occupants cooperating with the officers' orders as the officers reasonably believed that the vehicle contained two handguns and two armed-robbery suspects).

Plaintiff repeatedly cites to *Melendez-Garcia* as establishing the unlawfulness of her detention.  *See doc. 40* at 10-12 (citing 28 F.3d at 1052-53).  *Melendez-Garcia*, though, is distinguishable.  There, police officers stopped two vehicles based on a corroborated tip that their occupants were transporting drugs, ordered the occupants out of the vehicles at gunpoint, directed them to walk backwards towards the officers, handcuffed the occupants, and placed them in patrol cars.  *See Melendez-Garcia*, 28 F.3d at 1050.  The Tenth Circuit held that the use of handcuffs and firearms transformed the occupants' seizure into an unlawful arrest because the officers "outnumbered the [occupants],

executed the stop on an open highway during the day, had no tips or observations that the [occupants] were armed or violent, and the [occupants] had pulled their cars to a stop off the road and stepped out of their cars in full compliance with police orders." *Id.* at 1053.  Here, by contrast, Defendants Ames and War reasonably believed that the driver of the vehicle containing Plaintiff was armed and lethally dangerous, that Plaintiff was associated with him, and that Plaintiff may have access to a firearm.

Plaintiff also contends that her detention in handcuffs at gunpoint was unreasonable because there were "four or more officers present at the scene that could have easily watched [her] as opposed to endangering her life and then arresting her." *See doc. 40* at 12.  The Fourth Amendment, though, "does not require police to use the least intrusive means in the course of a detention, only reasonable ones."  *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1222 (10th Cir. 2005) (cleaned up) (quoting *Melendez-Garcia*, 28 F.3d at 1052).  On occasion, the Tenth Circuit has considered whether the police outnumber an individual when assessing whether handcuffing her at gunpoint was reasonable.  *See, e.g., Melendez-Garcia*, 28 F.3d at 1053.  But the mere fact that police outnumber a person reasonably believed to be armed and dangerous does not make handcuffing that person at gunpoint unreasonable.  *See Neff*, 300 F.3d at 1221.

B.  PLAINTIFF'S OTHER CLAIMS AGAINST DEFENDANTS AMES AND WAR,
WHILE RIPE FOR THE CONSIDERATION OF SUMMARY JUDGMENT, ARE
NOT PROPERLY BEFORE THE COURT

As noted earlier, a claim of unlawful seizure is not the only Fourth Amendment

claim that Plaintiff has raised against Defendants Ames and War: she also alleges claims

of unlawful search, pretextual seizure, and excessive force.  *See doc. 9* at ¶ 28.  These

three claims and Defendants Ames and War's qualified immunity defenses to them

appear ripe for summary judgment because facts underlying Plaintiff's claim for

unlawful seizure underlie them as well.  Based on the undisputed material facts before

it, the Court anticipates that Defendants Ames and War are entitled to summary

judgment on their qualified immunity defenses to Plaintiff's Fourth Amendment claims

for unlawful search, pretextual seizure, and excessive force.

Plaintiff, though, has not had the opportunity to be heard on these issues or

produce evidence of additional material facts that may make summary judgment on her

remaining Fourth Amendment claims inappropriate.  Therefore, pursuant to Federal

Rule of Civil Procedure 56(f), the Court gives Plaintiff notice of its intent to grant

Defendant Ames and War summary judgment on these claims *sua sponte* based on the

facts found herein and sets a briefing schedule for Plaintiff to be heard on this issue.

1.  *Plaintiff's Claims for Unlawful Search*

Plaintiff claims that Defendants Ames and War conducted an unreasonable

search by gathering personal information about her while she was detained.  *See doc. 9*

at ¶ 28.  The Tenth Circuit and other circuit courts of appeal, however, allow officers to

gather personal, identifying information from passengers during an investigatory

detention as reasonable precaution to protect officer safety.  *See United States v.*

*Fernandez*, 600 F.3d 56, 62–63 (1st Cir. 2010); *United States v. Diaz-Castaneda*, 494 F.3d

1146, 1152 (9th Cir. 2007); *United States v. Soriano-Jarquin*, 492 F.3d 495, 500 (4th

Cir.2007); *Rice*, 483 F.3d at 1083-84.  Based on this precedent and the facts before it, *see*

UMFs 23-27, the Court anticipates that Defendants Ames and War are entitled to

summary judgment on Plaintiff's claim for unlawful search arising from her

interrogation during detention.

Plaintiff also claims that another unknown law enforcement officer conducted an

unlawful search several hours after her detention by calling the other passenger in the

truck, asking to speak to her, and requesting that she provide him with her name,

address, and phone number.  *See doc. 9* at ¶ 28.  Based on the facts before it, *see* UMFs

33-34, this phone call appears to be a consensual encounter that Plaintiff could have

terminated at any time by hanging up the phone.  *See Jepsen v. Vescovo*, No. 14-CV-914-

W-DGK, 2016 WL 927232, at *3 (W.D. Mo. Mar. 10, 2016) (holding that a phone call

between a law enforcement officer and an individual is a consensual encounter unless

the officer threatened the individual or told her that she was legally obligated to talk to

him).  As consensual encounters fall outside the scope of the Fourth Amendment's

protection, the Court anticipates that Plaintiff's claim for unlawful search arising from this phone call is subject to summary judgment.

2.   *Plaintiff's Claim for Pretextual Seizure*

Plaintiff also claims that Defendants Ames and War violated her Fourth Amendment rights by seizing her for a discriminatory, or other unspecified, pretext. *See doc. 9* at ¶¶ 28, 30.  However, in *Whren v. United States*, 517 U.S. 806 (1996), the Supreme Court held that there is no claim for pretextual seizure under the Fourth Amendment.  *See* 517 U.S. at 513 ("[T]he constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment.  Subjective intentions play no role in ordinary … Fourth Amendment analysis.").  Therefore, based on the facts before it, *see* UMFs 1-24, the Court anticipates that Defendants Ames and War are entitled to summary judgment on Plaintiff's Fourth Amendment claim for pretextual seizure.

3.   *Plaintiff's Claim for Excessive Force*

Plaintiff further claims that Defendants Ames and War used excessive force against her while investigating whether the driver of the truck in which she was a passenger had committed an armed robbery a few hours earlier.  *See doc. 9* at ¶ 28.  A claim for excessive force during a seizure is analyzed under the Fourth Amendment's reasonableness standard and is a distinct claim from a claim of unlawful seizure.  *See Cortez*, 478 F.3d at 1125-27.  "In order to recover on an excessive force claim, a plaintiff

must show: (1) that the officers used greater force than would have been reasonably necessary to effect a lawful seizure, and (2) some actual injury caused by the unreasonable seizure that is not de minimis, be it physical or emotional." *See id.* at 1129 n.25 (citing *Tarver v. City of Edna*, 410 F.3d 745, 752 (5th Cir. 2005)).

"[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989).  Generally, whether the force used to carry out a particular seizure is reasonable depends on the totality of that seizure's circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Cortez*, 478 F.3d at 1125 (quoting *Graham*, 490 U.S. at 396).  But where the only force used by officers was handcuffing an individual at gunpoint, and this force did not make the seizure an arrest, the force used by the officers to execute that seizure was reasonable. *See Ellsworth*, 850 F. App'x at 626-27.

Based on the undisputed material facts, the only force that Defendants Ames and War used when detaining Plaintiff was handcuffing her at gunpoint. *See* UMFs 26-27. The Court's conclusion that this force did not transform Plaintiff's seizure into an arrest compels the conclusion that the force used by Defendants Ames and War to seize Plaintiff was reasonable and not excessive. *See Ellsworth*, 850 F. App'x at 626-27. Therefore, the Court anticipates that, based on the undisputed material facts before it,

Defendants Ames and War are entitled to summary judgment on Plaintiff's claim for excessive force.

## V.  CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that Defendants Ames and War's Motion for Summary Judgment (*doc. 31*) is GRANTED IN PART, and that Plaintiff's Fourth Amendment claim against them for unlawful seizure is DISMISSED.

IT IS FURTHER ORDERED that the parties SHALL FILE SUPPLEMENTAL BRIEFING on whether, based on the undisputed material facts found herein, Defendants Ames and War are entitled to summary judgment on Plaintiff's Fourth Amendment claims for excessive force, pretextual seizure, and unreasonable search. Plaintiff's supplemental brief is due **within fourteen (14) days of the issuance of this Order**.  Deadlines for Defendants Ames and War's response[9] and Plaintiff's reply shall follow Local Rule 7.4(a).

Finally, IT IS LIKEWISE ORDERED that the stay on discovery imposed by the Court's Stipulated Order Staying Discovery, *see doc. 34*, is EXTENDED pending the Court's resolution of whether Defendants Ames and War are entitled to summary judgment on Plaintiff's remaining Fourth Amendment claims.

---

[9] Any arguments by Defendant BCCSFC about the propriety of summary judgment on Plaintiff's *Monell* claims against it must be raised in a separate motion.  *See Hartford Cas. Ins. Co. v. Trinity Universal Ins. Co. of Kan.*, Civ. No. 12-1110 MV/KK, 2015 WL 12720321, at *1 n.1 (D.N.M. Apr. 17, 2015); *Huerta v. Bioscrip Pharmacy Servs., Inc.*, CIVIL NO. 09-485 RHS/LFG, 2010 WL 11523887, at *1 n.1 (D.N.M. June 17, 2010).

**IT IS SO ORDERED.**

_____
GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE
**Presiding by consent**